IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL K. HUNT,<br><br>              Petitioner,<br><br>        vs.<br><br>SCOTT KERNAN, Secretary, California<br>Department of Corrections and<br>Rehabilitation,[1]<br><br>              Respondent. | No. 2:15-cv-01564-JKS<br><br>MEMORANDUM DECISION |

      Russell K. Hunt, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. At the time he filed the Petition, Hunt was in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Chuckawalla Valley State Prison. It appears that Hunt has since been released on supervised parole, as a search on the Department of Corrections and Rehabilitation's inmate locator website (http://inmatelocator.cdcr.ca.gov/, Inmate No. AP4152) has no record of him. Hunt has filed a change of address with this Court that lists a private residence. Respondent has answered, and Hunt has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

      On October 23, 2012, Hunt was charged with stalking (Count 1), stalking with a court order in effect (Count 2), and contempt of court for disobeying a court order (Count 3). Hunt

---

[1]       Because it appears that Hunt has been released from prison but is on post-release supervision, Scott Kernan, Secretary, California Department of Corrections and Rehabilitation, is substituted for the People of the State of California. FED. R. CIV. P. 25(c); Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts; *Stanley v. Cal. Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994).

pled not guilty and, prior to trial, his *Faretta*[2] motion to represent himself was granted. After the

People rested and Hunt was advised to call his first witness, Hunt moved to be represented by

counsel. The Court denied the motion. After the jury found him guilty on all counts and ordered

him to be remanded to the county jail, Hunt made another motion to be represented counsel. The

court deferred ruling on the motion to allow Hunt an opportunity to review the pre-sentencing

report before deciding whether he wanted to be represented by counsel at sentencing. The

motion was not revisited after that.

On direct appeal of his conviction, the California Court of Appeal laid out the following

facts underlying the charges against Hunt and the evidence presented at trial:

> Beginning in 2010 [Hunt's] and Lemke's paths crossed as both performed
> karaoke in local clubs. Lemke performed karaoke several nights a week, every other
> week, at both the Castle and Showboat clubs. [Hunt] also frequented both karaoke spots.
> Lemke occasionally said hello to [Hunt] but did not have any other interaction with him.
> A karaoke operator testified that on a few occasions [Hunt] would enter the bar after
> Lemke and would sign up to sing right after her, requesting songs she had sung the week
> before.

> **Facebook Messages**
> In February 2011 [Hunt] sent Lemke a Facebook message about her relationship
> with a karaoke disc jockey (DJ). After Lemke failed to respond, [Hunt] sent a Facebook
> message assuring her he had no criminal convictions, never brought harm to others, and
> did not have a "dark side." Lemke found the message very strange. In a third message,
> [Hunt] told Lemke there was "an opportunity for us to be great friends and things get
> distorted." The message also stated they "might scare each other" and suggested they
> sing a duet at karaoke. [Hunt] apologized for being shy, which he said was caused by
> "abusive times."
> Lemke finally responded to the messages. She told [Hunt] she preferred a private
> life and was not interested in pursuing a friendship with him.
> The Facebook messages from [Hunt] continued. In one message [Hunt] told a
> story about a woman named Sheryll who was distraught because her husband had beaten

---

2        *Faretta v. California*, 422 U.S. 806 (1975) (holding that a defendant in a state
criminal trial has the constitutional right to refuse appointed counsel and represent himself when
he does so voluntarily and intelligently).

her.  [Hunt] comforted the woman and told her she could end the "nightmare" by getting a restraining order and a divorce.  Lemke found the message disturbing and asked him to stop sending her messages.  She said she would see [Hunt] at the Showboat but asked that he respect her earlier decision.

Lemke later saw [Hunt] at the Showboat; she told him he misunderstood her situation and asked him to stop bothering her.  Lemke attempted to distance herself from [Hunt] when she went to the karaoke bars.  She asked the karaoke DJ's to separate them in the singing lineup in an effort to avoid contact with [Hunt].

## Messages, Letters, and Gifts

[Hunt] continued to send Lemke messages.  He also sent a karaoke machine, along with a letter and a picture of Shrek cartoon characters that were intended to represent the two of them, to Lemke at a prior employer's address.  In the letter, [Hunt] stated he was encouraging Lemke to pursue her singing in a way he hoped was "not too intrusive."  Lemke responded that [Hunt] was being too intrusive and asked that their relationship remain "strictly social" and he not invade her privacy again.

[Hunt] admitted he found Lemke "interesting" and that he had found her former employer on one of her old online profiles.  [Hunt] asked Lemke to forgive him and told her, "I have found often people stumble when they are getting to know each other.  I promise to be more thoughtful.  No harm was intended."

[Hunt], in March 2011, sent Lemke a message telling her of a revelation from God informing him that he and Lemke would be married someday.  Although Lemke, with the help of a friend, wrote [Hunt] a letter telling him to leave her alone, [Hunt] continued to contact her.

Subsequently, [Hunt] began sending messages to Lemke's e-mail, although she had not given him her address.  [Hunt] found the address in an online profile.  He told Lemke there was no need to put a wall between them.  [Hunt] talked about Lemke being an abuse victim and told her he hoped the greatest romantic relationship she would ever have would be with him.  [Hunt] admitted he believed he frightened her at times.

Lemke was afraid because she did not know how [Hunt] was discovering her contact information or why he was making assumptions about her.  Again, Lemke informed [Hunt] she did not want to be friends or have a relationship.  Lemke requested that he cease contacting her and threatened legal action if he ignored her request.  She blocked [Hunt] on Facebook.

At this point, Lemke contacted local law enforcement about [Hunt's] continuing unwelcome attentions.  The police suggested a restraining order.  Lemke did not pursue the option because she hoped [Hunt] would cease if she avoided and ignored him.  In addition, Lemke did not know how [Hunt] would react if she obtained one.

[Hunt's] attentions did not cease.  He suggested to a third party that the third party contact Lemke about a singing position in that person's band.  Lemke received flowers at her home from [Hunt] on Mother's Day.  [Hunt] also sent her a pair of T-shirts he had made with her picture on them and a nickname he thought she should use in her singing career.  The arrival of these gifts at her home frightened Lemke.

The next time she went to the Showboat, Lemke brought the T-shirts. She gave them back to [Hunt] and told him not to send her anything again. Later that evening, [Hunt] put on one of the T-shirts and wore it around the club. Lemke told him to take it off. [Hunt] responded that he would talk to Lemke's ex-husband about it, using her ex-husband's name. Lemke had never mentioned her ex-husband to [Hunt]. [Hunt] also threatened to contact her employer and get her fired.

[Hunt] also left things on Lemke's car when it was parked outside the karaoke bars. Lemke believed he left a Shania Twain autobiography on her car. [Hunt] left a note encouraging her to pursue a career as a teacher. [Hunt] left a CD of his songs on her seat at the karaoke bar. On Lemke's birthday, [Hunt] had her birthday put up on the "birthday board" at the bar.

**Contact with Lemke's Boyfriend and Ex-husband**

When Lemke began dating Justice Larson in September 2011, she told him about [Hunt]. Larson noticed [Hunt] frequently watched Lemke. When Lemke and Larson occasionally kissed in the bar parking lots, [Hunt] would walk past them sometimes, chanting "Justice, she is yours." The first time [Hunt] walked past Lemke and Larson in the parking lot, Lemke asked [Hunt] if he was following her and [Hunt] admitted he was "looking out for my friend."

In October 2011 Lemke's ex-husband received a letter from [Hunt] in which [Hunt] accused Lemke of lying. [Hunt] also provided details regarding Lemke's financial situation so her ex-husband could reduce his payments. In addition, [Hunt] stated Lemke had a mental illness and had been molested by her father, facts which [Hunt] suggested could help her ex-husband gain full custody of their children. [Hunt] wrote another letter to Lemke's ex-husband in which he mentioned a kidnapping and a posttraumatic stress disorder that he might have learned about from Lemke's mother.

**Music CD's**

In late 2011 Lemke told friends about a dream she had of her late father. It was a beautiful dream that "brought a smile" to her heart. [Hunt] was nearby when she talked about the dream. A few months later, Lemke found a song by [Hunt] on the Internet entitled "Every Day You Bring a Smile to My Heart," accompanied by a picture of Lemke and her name. On the Web site [Hunt] wrote that the song had been inspired by Lemke and was his response to her father's death. [Hunt] left a CD with the song on it on Lemke's car, with a note stating that he would give her 10 percent of any profits from the song.

Lemke believed [Hunt] was constantly monitoring her. The fact that [Hunt] put her picture up on music Web sites along with the song particularly upset her. Music Web sites also had another of [Hunt's] songs that referenced Lemke and contained facts about her life that she had never told him.

In July 2012 Lemke and a friend sat at the Showboat bar. [Hunt's] CD was on the bar and they began to discuss his music. Lemke's friend asked [Hunt] to come over even though the friend was aware of Lemke's discomfort with [Hunt]. When [Hunt] sat down by them, Lemke told her friend never to pull her into a conversation with [Hunt] and

walked away.  After Lemke heard [Hunt] describe her as crazy, she threw water in his face.

**Lemke Moves and Obtains Restraining Orders**

By the summer of 2012 Lemke had moved.  She began receiving notes and gifts from [Hunt] at her new address.  [Hunt] sent Lemke a note telling her to have her taillight fixed, accompanied by $40.  He also left a box of painting supplies next to her mailbox with a note telling her to paint her car because it looked like a "meth-mobile."  Lemke was terrified because [Hunt] had physically left the painting supplies at her new residence.  She feared he was watching her and her children and that he might harm them.

Lemke did not know what [Hunt] was capable of, but she knew he would not leave her alone.  After she saw a picture on the cover of a CD of [Hunt] holding a gun, she became even more afraid for her safety.  Lemke decided to obtain a restraining order, and in August 2012 the court issued a temporary restraining order, followed by a permanent restraining order.

After Lemke had a friend serve [Hunt] with the temporary restraining order, [Hunt] sent her a letter telling her she suffered from schizophrenia and needed treatment.  [Hunt] offered to pay for the treatment.  This disturbed Lemke, who did not have schizophrenia.  Not long after, [Hunt] e-mailed and mailed to Lemke's sister-in-law's employer a note warning that Lemke was schizophrenic and encouraging the family to get her into treatment.

[Hunt] mailed three more letters to Lemke's residence.  In the first, [Hunt] sought discovery in preparation for the hearing on the restraining order and named Lemke's minor son as one of his witnesses.  He stated friends of Lemke "are hostile witnesses against you and you must submit this to the Court," she would have to compensate them for lost wages, and she would have to "serve them with a subpoena."  He threatened to bring Lemke's family into court and to file a lawsuit against her.  In the second letter, [Hunt] threatened to have Lemke arrested for using a phony name.  He also sent a copy of a letter he had sent to the court, urging the court to run checks on Lemke with various state and government agencies.  The third letter requested the immediate issuance of a bench warrant for Lemke for using a false identity.

After [Hunt] was arrested for violating the temporary restraining order, he filed a civil lawsuit against Lemke for defamation.  He also tried to obtain a restraining order against her.  [Hunt] sent letters to Lemke's friends, her mother, and her attorney.  He sent Lemke's employers subpoenas with handwritten notes containing claims about Lemke's mental state.

Lemke purchased pepper spray and a stun gun to protect herself after [Hunt]  was released from custody.  She took a concealed weapons course and outfitted her home with an alarm system.  [Hunt] eventually dropped his lawsuit against her.

**Prior Uncharged Conduct**

The prosecution also introduced evidence of prior uncharged conduct under Evidence Code section 1101, subdivision (b).

*Maureen Pierson*

Maureen Pierson met [Hunt] during their participation in a 12–step program 22 years before. [Hunt] began leaving Pierson gifts and notes on the group bulletin board or on top of her car, though Pierson had no personal relationship with [Hunt]. Among the gifts was a framed photograph of a Porsche with her maiden name on it and a rubber doll in a nurse's uniform wired to the photo. Pierson never worked as a nurse. On another occasion, Pierson found a cup of flowers with her name on it in the bathroom.

Pierson told [Hunt] to leave her alone. However, [Hunt] continued to contact her and write her letters. Pierson contacted the police because [Hunt] was disrupting her life. [Hunt] obtained Pierson's address and phone number and left messages on her answering machine. He told Pierson that God had told him they were to be together and that her fiancé was in the way. [Hunt] said he wanted to be friends with Pierson's son. Although Pierson obtained a restraining order, [Hunt] did not stop contacting her.

*Brandi Hood*

Brandi Hood worked at a bar that [Hunt] frequented in 2005. Hood considered [Hunt] only a customer, but [Hunt] would often leave her notes with his phone number. He also left a college catalog to which he had taped a photo he had taken of her without her knowledge. Somehow, [Hunt] discovered Hood's home address and had a box of schoolbooks delivered to her home. After [Hunt] ignored Hood's request that he leave her alone, she obtained a restraining order. [Hunt] sent "slanderous" letters to Hood's boss and to owners of businesses near the bar.

**Defense Case**

[Hunt] testified he first met Lemke when he was selling cherries at his home in June 2010. The two spoke, and Lemke mentioned her son. He gave Lemke the karaoke machine to encourage her to branch out and sing new songs. He admitted he tended to write romantic letters.

[Hunt] stated he saw Lemke suffer a panic attack in April 2011 that endangered her son. He sent Lemke flowers after the incident. [Hunt] sent Lemke money and supplies to fix her car in order to help her get jobs. Because he believed Lemke suffered from schizophrenia, he offered to pay for psychiatric help. He sent her T-shirts to help promote her singing. It was after he sent the shirts that Lemke told him to leave her alone.

[Hunt] testified he frequently saw Lemke's car in front of his home. Once he saw Lemke following him. In 2011 [Hunt] drafted a restraining order against Lemke but never filed it. At the beginning of 2012 Lemke confronted him and threatened to "get" him. [Hunt] had no idea what she was talking about. Lemke threw water in his face because she was upset about [Hunt] singing his original songs at the karaoke bar.

When Lemke had [Hunt] served with the restraining order, [Hunt] told her to stay out of his life. [Hunt] sought to have Lemke arrested for using a false name before he realized she had changed her name. Since that time, [Hunt] had avoided Lemke.

Lauren Huey, an employee at the Showboat, testified about the incident in which Lemke threw water in [Hunt's] face. Huey never saw [Hunt] behave in an offensive manner toward anyone.

*People v. Hunt*, No. C073880, 2015 WL 534583, at *1-5 (Cal. Ct. App. Feb. 9, 2015).

As aforementioned, at the conclusion of trial, the jury found Hunt guilty on all counts. He was subsequently sentenced to an aggregate determinate imprisonment term of 4 years and 8 months. The court also imposed a lifetime sex offender registration requirement pursuant to California Penal Code § 290.006.[3]

Through counsel, Hunt appealed the conviction, arguing that: 1) there was insufficient evidence to support the guilty verdicts on Counts 1 and 2; 2) the trial court erred in denying Hunt's mid-trial and post-trial requests for representation; 3) his rights to present a complete defense were violated when the court instructed the jury that discovery did not apply to the restraining order proceedings; and 4) his constitutional right to an impartial jury was violated when the court failed to excuse a juror who had asked the bailiff if he should be concerned for his safety because of this "nut job," referring to Hunt. Hunt also filed a supplemental brief challenging the trial court's imposition of a lifetime sex offender registration requirement.

---

[3]     That provision provides:

Any person ordered by any court to register pursuant to the [Sex Offender Registration] Act for any offense not included specifically in subdivision (c) of Section 290, shall so register, if the court finds at the time of conviction or sentencing that the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification. The court shall state on the record the reasons for its findings and the reasons for requiring registration.

CAL. PENAL CODE § 290.006.

Noting that Respondent agreed that the sex offender registration requirement should be remanded to the trial court to ensure that it properly exercised its discretion, the Court of Appeal unanimously vacated the trial court's order requiring Hunt to register as a sex offender but affirmed the judgment against Hunt in all other respects.[4]  Hunt petitioned for review of his claims that: 1) there was insufficient evidence to support the guilty verdicts on Counts 1 and 2; 2) the trial court erred in denying Hunt's mid-trial and post-trial requests for representation; and 3) his rights to present a complete defense were violated when the court instructed the jury that discovery did not apply to the restraining order proceedings.  The California Supreme Court summarily denied review on May 18, 2015.

While his appeal was pending, Hunt filed in the California Superior Court a *pro se* petition for habeas relief in which he averred that he was denied counsel at trial and at sentencing and that he suffered a sentence for two crimes that constituted a course of conduct, in violation of the protection against Double Jeopardy.  On May 14, 2015, the superior court denied the petition on the ground that his direct appeal, which the court contended raised both habeas issues, was still pending.

Hunt then filed another *pro se* petition for habeas relief in the California Court of Appeal. In that petition, Hunt argued that: 1) his convictions were not supported by legally sufficient evidence; 2) the jury was not adequately instructed as to the elements of the crimes; 3) the

---

[4]        On remand, the trial court found that Hunt committed the crimes as a result of sexual compulsion or for purposes of sexual gratification and again ordered Hunt to register as a sex offender pursuant to California Penal Code § 290.006.  On appeal of that decision, the Court of Appeal unanimously reversed, concluding that the trial court's finding was not supported by the record and thus could not be the basis for an order requiring lifetime sex offender registration.  *People v. Hunt*, No. C081377, 2017 WL 2825808, at *3 (Cal. Ct. App. June 30, 2017).

statutory language defining "stalking" is unconstitutionally vague; 4) the trial judge committed obstruction of justice by refusing to admit certain evidence; 5) he suffered a sentence for two crimes that constituted a course of conduct, in violation of the protection against Double Jeopardy; and 6) he is being subjected to false imprisonment due to judicial misconduct. The Court of Appeal denied the petition without comment on August 27, 2015. Hunt did not seek habeas relief in the California Supreme Court.

While his habeas petition was pending in the Court of Appeal, Hunt timely filed a *pro se* Petition for a Writ of Habeas Corpus in the United States District Court for the Central Distict of California on June 17, 2015. *See* 28 U.S.C. § 2244(d)(1)(A). Because Hunt's conviction occurred in the Shasta County Superior Court, which is located within the jurisdictional boundaries of the Eastern District of California, the Petition was transferred to this Court. Docket No. 5. A previously-assigned magistrate judge found that a number of the claims presented in the Petition were not fully exhausted in the state courts. Docket No. 11. In response to the Court's order that he indicate how he wished to proceed, Hunt moved to proceed on the claims that the magistrate judge had found were exhausted in the state courts. Docket No. 14. The remaining claims are now pending before the undersigned judge and ripe for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Hunt proceeds on the following claims: 1) denial of right to an impartial jury; 2) insufficient evidence to support the convictions; 3) denial of counsel; and 4) judicial misconduct.[5]

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

---

[5] For ease of reference, the Court uses the numbering of the claims as used in the Court's order at Docket No. 15 rather than Hunt's numbering in the mixed Petition.

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"
*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Hunt has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v.*

*Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

A.     Mootness

Article III, § 2 of the United States Constitution requires the existence of a case or controversy through all stages of federal judicial proceedings. This means that, throughout the litigation, the petitioner "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted); *see also Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."). If an event occurs subsequent to the filing of a lawsuit which deprives a court of the ability to provide meaningful relief, the case becomes moot and is subject to dismissal. *See United States v. Alder Creek Water Co.*, 823 F.2d 343, 345 (9th Cir. 1987) ("A case becomes moot when interim relief or events have deprived the court of the ability to redress the party's injuries."). Similarly, a claim for habeas relief becomes moot when the controversy between the parties is no longer alive because the party seeking relief has obtained the relief requested. *See*, *e.g.*, *Picrin-Peron v. Rison*, 930 F.2d 773, 776 (9th Cir. 1991) (a claim is moot when the court no longer has power to grant the requested relief).

As previously mentioned, the record before this Court indicates that Hunt has been released from prison. However, a petition for habeas corpus relief does not necessarily become moot when the petitioner is released from prison. Rather, the matter will remain a live case or

controversy if there remains "some concrete and continuing injury" or "collateral consequence" resulting from the conviction. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998). The Supreme Court has made clear that courts are to "presume that a wrongful criminal conviction has continuing collateral consequences (or, what is effectively the same, to count collateral consequences that are remote and unlikely to occur)." *Id*. at 7-8 (citing *Sibron v. New York*, 392 U.S. 40, 55-56 (1968)). This presumption of collateral consequences "acknowledge[s] the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences." *Sibron*, 392 U.S. at 55. Accordingly, Hunt has no duty to prove collateral consequences of his custody, and his Petition has not been rendered moot by his release from prison.

B.      Merits

Ground 1.      *Deprival of impartial jury*

Hunt first argues that the trial court violated his constitutional right to an impartial jury by failing to excuse a juror who referred to Hunt as a "nut job" and had asked the court bailiff if he should be concerned for his safety. The Court of Appeal, in considering this claim on direct appeal, summarized the following factual background to this claim:

> During the prosecution's case, juror No. 10 approached the bailiff and expressed concern for his safety. Juror No. 10 asked the bailiff if he should be "concerned for his safety and of this nut job," a reference to [Hunt].
> Prior to questioning the juror, the court stated: "[I]t strikes me that because of the things that you are doing during the course of the trial even, which no lawyer would be allowed to do, you may be planting some seeds of concern within the mind of the jurors. Now, that is completely, I think, a normal human response. However, they are required by law to maintain the presumption of innocence as well as not considering or coming to a conclusion, not reaching an opinion, expressing that opinion and so on. However, I think that you are the one—you are the one that is causing the trouble potentially, if there is trouble and I want to nip it in the bud."
> The court then questioned juror No. 10 about his comments to the bailiff. Juror No. 10 explained, "I didn't use the right words. It was just something that came out because it was something that I was thinking about." When asked by the court if he

13

could be fair and listen to the rest of the evidence, had retained in his mind the concept of the presumption of innocence, and whether he would remain open-minded and not come to any conclusions prior to the deliberation process, juror No. 10 responded in the affirmative.

        The court allowed [Hunt] to voir dire the juror. The juror testified that he did not ask the bailiff if he needed protection. Juror No. 10 was unsure exactly what he had said but testified it had been a "poor choice of words," blurted out in jest. He approached the bailiff because the trial court had instructed the jurors to go to the bailiff and not to the other jurors. Juror No. 10 did not mention the incident to the other jurors. Following the questioning of juror No. 10, the trial resumed.

*Hunt*, 2015 WL 534583, at *12.

As an initial matter, Respondent correctly argues that this claim is unexhausted. This Court may not consider claims that have not been fairly presented to the state courts. 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases). To be deemed exhausted, a claim must have been presented to the highest state court that may consider the issue presented. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). To have properly exhausted his state court remedies, Hunt must have presented both the legal arguments and the factual basis to the highest state court. *See Peterson v. Lampert*, 319 F.3d 1153, 1155-56 (9th Cir. 2003). In this Court's prior order at Docket No. 15, a previously-assigned magistrate judge initially concluded that this claim was exhausted because it had been presented on direct appeal to the Court of Appeals. A review of the record, however, indicates that, although the claim was presented in the counseled brief before the Court of Appeals, it was not raised in the petition for review in the California Supreme Court. Because this claim would now be untimely before the state courts, Hunt may not now return to state court to exhaust it, and the claim may be deemed

exhausted but procedurally defaulted from habeas review.[6]  *See Nigro v. Sullivan*, 40 F.3d 990,

997 (9th Cir. 1994).

Moreover, even if Hunt had fully exhausted the claim, he still would not be entitled to

relief on it.  The Sixth Amendment to the United States Constitution provides that "[i]n all

criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an

impartial jury*."  U.S. CONST. amend VI (emphasis added).  The right to an impartial jury is

further applicable to the states by way of the Fourteenth Amendment.  *See Irvin v. Dowd*, 366

U.S. 717, 722 (1961).  "The bias or prejudice of even a single juror is enough to violate that

guarantee."  *United States v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013) (quoting *United States

v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000)).  However, the constitution "does not require

a new trial every time a juror has been placed in a compromising situation."  *Tinsley v. Borg*, 895

F.2d 520, 524 (9th Cir. 1990) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).  "Due

process means a jury capable and willing to decide the case solely on the evidence before it, and

a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such

occurrences when they happen."  *Id*. (quoting *Phillips*, 895 F.2d at 217).

The Ninth Circuit has recognized three forms of juror bias: 1) "actual bias, which stems

from a pre-set disposition not to decide an issue impartially"; 2) "implied (or presumptive) bias,

which may exist in exceptional circumstances where, for example, a prospective juror has a

relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a

---

[6]        A petitioner may overcome procedural default by establishing good cause and
prejudice.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Hunt did not respond by way of
Traverse to Respondent's exhaustion defense and therefore apparently does not allege that good
cause and prejudice exists.

material fact to get on the jury"; and 3) "so-called *McDonough*-style bias, which turns on the truthfulness of a juror's responses on voir dire" where a truthful response "would have provided a valid basis for a challenge for cause." *Fields v. Brown*, 503 F.3d 755, 766-67 (9th Cir. 2007) (citing *McDonough Power Equip. v. Greenwood*, 464 U.S. 548 (1984) (plurality)).

Hunt does not argue that the juror answered questions dishonestly during voir dire, and thus his complaint appears to implicate the theory of implied bias. The Ninth Circuit has concluded that, although the Supreme Court has never held that a juror was impliedly biased in absence of juror dishonesty in voir dire, concurring opinions in Supreme Court cases have not foreclosed the possibility of finding implied bias in such circumstances, and claims to that effect are cognizable on federal habeas review. *Fields*, 503 F.3d at 771-72; *see also Dyer v. Calderon*, 151 F.3d 970, 984 (9th Cir. 1998) (finding implied bias claim cognizable on federal habeas review because "[p]resumed bias dates back in this country at least to Aaron Burr's trial for treason").

"It is well accepted that bias may be presumed only in 'extreme' or 'extraordinary' cases." *Fields*, 503 F.3d at 772. Most of the Ninth Circuit's decisions presuming bias as a matter of law have involved situations "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Olsen*, 704 F.3d at 1191 (quoting *Fields*, 503 F.70 at 770). "Prudence dictates that courts answering this question should hesitate before formulating categories of relationships which bar jurors from serving in certain types of trials." *Tinsley v. Borg*, 895 F.2d 510, 527 (9th Cir. 1990). A court might, however, presume bias where a juror or his close relatives have been personally involved in a situation with a fact

pattern similar to the crime.  *Id*. at 528.  Hypothetically, a court might likewise presume bias where it is revealed that the juror is an actual employee of the prosecuting agency, where the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.  *Id*.

Where a post-trial hearing has been held on juror impartiality and the fact-finding process was objective and reasonably explored the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness.  *Dyer*, 151 F.3 at 975.  A petitioner must therefore present clear and convincing evidence to rebut this presumption.  28 U.S.C. § 2254(e)(1); *Miller-El*, 537 U.S. at 340.  The Supreme Court has made it clear that on federal habeas review, the determination of juror bias "is essentially one of credibility, and therefore largely one of demeanor."  *Tinsley*, 895 F.2d at 525 (quoting *Patton v. Yount*, 467 U.S. 1025, 1038) (internal quotation marks omitted).  The findings of state trial and appellate courts on juror impartiality deserve "a high measure of deference."  *Id*. (citation omitted).

Here, Hunt has not rebutted with clear and convincing evidence the state trial court's finding of no bias.  Rather, Hunt urges this Court to re-assess the testimony and credibility of the juror.  As the state appellate court recognized, however:

> the trial court was in the best position to evaluate the nature and seriousness of juror No. 10's comment regarding Hunt.  Juror No. 10 answered the court's questions and admitted his remarks had been a "poor choice of words," blurted out in jest.  The trial court accepted this explanation, evaluated juror No. 10's responses and demeanor, and declined to excuse juror No. 10.  Given the evidence before us, we cannot find the trial court's decision an abuse of discretion.  Substantial evidence supports the court's determination that juror No. 10 could remain impartial.

*Hunt*, 2015 WL 534583, at *13.

The Court of Appeal further reasoned that:

juror No. 10's comments did not reflect an improper opinion formed about the case. Instead, juror No. 10 made a brief comment about [Hunt's] demeanor during trial, labeling him a "nut job" and inquiring about his own safety. While it is troubling that a juror would describe [Hunt] in such negative terms, juror No. 10 did not express any opinion about whether or not [Hunt] committed the crimes he was accused of or any opinion as to [Hunt's] veracity.

*Id.*

As previously stated, federal law is clear that the state court was in the best position to assess the demeanor and weigh the credibility of the juror in question. *See Yount*, 467 U.S. at 1038 ("Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying. . . . Demeanor, inflection, the flow of questions and answers can make confused and conflicting utterances comprehensible."). In light of the deference afforded the state court's decision and the absence of clear and convincing evidence that rebuts the presumption of correctness this Court must bestow upon it, Hunt is not entitled to a finding of presumed bias, and his claim must be denied.

Ground 2.     *Insufficiency of the evidence*

Hunt next argues that the prosecution presented insufficient evidence to sustain his convictions for stalking. As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence,

made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have

agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes

clear that it is the responsibility of the jury—not the court—to decide what conclusions should

be drawn from evidence admitted at trial." *Cavazos*, 132 S. Ct. at 3-4. Under *Cavazos*, "a

federal court may not overturn a state court decision rejecting a sufficiency of the evidence

challenge simply because the federal court disagrees with the state court. The federal court

instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4

(*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Hunt argues in his Petition, as he did on direct appeal, that the evidence did not establish

that his words or deeds constituted a threat of violence. The Court of Appeal described the

elements of counts 1 and 2 as follows:

> To find [Hunt] guilty of both stalking and stalking with a court order in effect, the
> jury had to find that [Hunt] made a credible threat with the intent to place Lemke in
> reasonable fear for her safety or the safety of her immediate family. (CALCRIM No.
> 1301.) A credible threat consists of "a verbal or written threat, including that performed
> through the use of an electronic communication device, or a threat implied by a pattern of
> conduct or a combination of verbal, written, or electronically communicated statements
> and conduct, made with the intent to place the person that is the target of the threat in
> reasonable fear for his or her safety or the safety of his or her family, and made with the
> apparent ability to carry out the threat so as to cause the person who is the target of the
> threat to reasonably fear for his or her safety or the safety of his or her family. It is not
> necessary to prove that the defendant had the intent to actually carry out the threat."
> ([CAL. PENAL CODE] § 646.9, subd. (g).).

*Hunt*, 2015 WL 534583, at *6.

In support of his claims that the evidence was insufficient to prove the above elements,

Hunt argued on direct appeal that:

> his conduct toward Lemke might have been "obnoxious, insensitive, offensive,
> misguided, invasive and any number of other things, but it was not a threat to Lemke's
> personal safety." According to [Hunt], "being creepy is not the same as making a
> credible threat of violence." [Hunt] characterizes his conduct toward Lemke as "juvenile

and harassing" and "paternalistic (and patronizing)," and describes himself as a "persistent but harmless eccentric" engaged in an "unconventional courtship."

*Id.*

But all of the evidence in support of his claim was before the jury for its assessment.

This Court is precluded from re-weighing the evidence or re-assessing witness credibility.

*Schlup*, 513 U.S at 330; *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004). In rejecting

this claim on direct appeal, the Court of Appeal reasoned:

> The totality of the evidence presented at trial supports the jury's conclusion that defendant made a credible threat sufficient to constitute stalking in count 1. [Hunt] contacted Lemke through Facebook messages, e-mails, and personal contact at karaoke bars. He repeatedly sent packages to her home and to her previous employer. [Hunt] left gifts on Lemke's seat at the bar and on her car. A ll of these efforts were in pursuit of a romantic relationship with Lemke. [Hunt] focused single-mindedly on the goal of making Lemke his wife.
>
> These efforts continued even though [Hunt] knew they disturbed Lemke and even though he realized his behavior was not normal. [Hunt] thoroughly researched Lemke's past and present life. He wrote songs about her personal life. [Hunt] sent letters to Lemke's former husband encouraging him to pursue full child custody based on Lemke's purported mental health issues. In addition, [Hunt] threatened to speak to Lemke's boss and get her fired.
>
> Lemke repeatedly tried to dissuade [Hunt], stressing she was not interested in a romantic relationship with him. She asked him to stop contacting her, to no avail. [Hunt] continued his unrelenting efforts to convince her they belonged together.
>
> Taken together, [Hunt's] words and actions support the finding of a credible threat against Lemke in count 1. He followed Lemke to the karaoke bars, found out where she worked, and eavesdropped on her conversations, all in an effort to convince her to become involved with him romantically. As time passed, [Hunt's] behavior became more pointed and his intrusions into Lemke's life more personal and threatening. This pattern of conduct put Lemke in the position of reasonably fearing for her safety.
>
> The evidence is also sufficient to support count 2, stalking with a court order in effect. After he was served with the temporary restraining order, [Hunt] sent a letter to Lemke. He pleaded with her to seek mental health counseling to treat her schizophrenia. [Hunt] also contacted Lemke's sister-in-law about Lemke's mental health. In a letter seeking discovery he stated Lemke's friends were hostile witnesses against her and said she would have to subpoena them to testify in court. Notwithstanding the court order, [Hunt] continued unabated in his pursuit of Lemke, leading her to fear for her and her family's safety.
>
> . . . .

While [Hunt] insists that "being creepy" is not the same as being threatening, there is a point at which creepy behavior can reasonably be regarded by someone of normal sensibilities as threatening behavior, intended to place the person in fear of harm. That point was reached here when [Hunt] defied Lemke's requests to be left alone and instead uncovered alternate ways to contact her, including e-mail and her home address, after she blocked his access on Facebook. These measures were not those of an eccentric paramour but of a predator intent on demonstrating his power to upset Lemke's understandable efforts to protect her privacy. Notes and gifts deposited on a doorstep from a legitimate suitor might be a sign of affection, but from [Hunt] they were a sign that he was watching her and knew where she lived. And then, after Lemke succeeded in gaining the protection of a restraining order, [Hunt] defied the order in a clear effort to demonstrate that not even the power of the state could stop him from reaching her. Lemke was terrified, as any single woman living alone with children would be. Lemke did not know what [Hunt] was capable of and feared for her safety, especially after she saw a picture of [Hunt] on a CD cover holding a gun. [Hunt] might not have made overt or physical threats, but the totality of his treatment of Lemke supports the jury's finding that Lemke experienced a credible threat.

*Hunt*, 2015 WL 534853, at *6-8.

That conclusion is both reasonable and fully supported by the record. Although it might have been possible to draw a different inference from other evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. Hunt bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous. 28 U.S.C. § 2254(e)(1). He has failed to carry such burden. For the reasons persuasively stated by the Court of Appeal, the record does not compel the conclusion that no rational trier of fact could have found that Hunt's words and deeds constituted a threat of violence, especially considering the double deference owed under *Jackson* and AEDPA. Hunt is therefore not entitled to relief on his legal insufficiency claim.

Ground 3.     *Denial of counsel*

Hunt additionally contends that the trial court erred in denying his two requests (mid-trial and post-trial) to withdraw his waiver of counsel[7] and appoint counsel to represent him. According to Hunt, the denial violated his right to counsel under the Sixth Amendment of the U.S. Constitution.  On consideration of this claim on direct appeal, the Court of Appeal laid out the following facts underlying this claim:

> Prior to trial, the trial court granted [Hunt's] request to represent himself at trial. The court recommended that [Hunt] be represented by counsel, but [Hunt] stated he had represented himself in other cases and felt confident in his ability.  [Hunt] said he would represent himself at the preliminary hearing, but if the case went to trial he would request counsel.
>
> The court understood [Hunt] was reserving his right to counsel at a future time and told [Hunt] his waiver of the right to counsel was not irrevocable.  The court explained that the subsequent granting of a request to appoint counsel depended on the proceedings.  A timely request for counsel would be generally granted, but an untimely request could be refused.  [Hunt] repeatedly stated he was giving up his right to counsel "[a]t this point in time."  The court again reminded [Hunt] that, although [Hunt] could later request counsel, whether the request would be granted "would depend on the circumstances present at the time of your request."
>
> [Hunt] represented himself at the preliminary hearing and through the prosecution's case-in-chief at trial.  After the prosecution rested its case, [Hunt], in front of the jury, told the court he would like to invoke his right to counsel.  The prosecution argued the request was an effort to sway the jury and was a disrespectful action against the court.
>
> After a recess and outside the presence of the jury, the court noted that at the preliminary hearing [Hunt] had examined witnesses and tried to introduce matters into evidence.  At trial, [Hunt] questioned jurors, exercised peremptory and for cause challenges during selection, and cross-examined the prosecution's witnesses.  Based on these observations, the court found [Hunt] had researched the law and was fully engaged in his self-representation.

---

[7]     The right to counsel guaranteed by the Sixth Amendment "has been interpreted to encompass 'an independent constitutional right' of the accused to represent himself at trial, and thus waive the right to counsel."  *Stenson v. Lambert*, 504 F.3d 873, 882 (9th Cir. 2007) (quoting *Faretta*, 422 U.S. at 806).  Such waiver, however, must be "knowing, voluntary, and intelligent."  *Iowa v. Tovar*, 541 U.S. 77, 87–88 (2004).  In his Petition, Hunt does not argue that his *Faretta* waiver was unknowingly made, and the record provides no support for such assertion.

The court inquired as to why [Hunt] sought counsel at that time. [Hunt] responded that he believed most of what he did was being objected to and he would not get a fair trial if he continued to represent himself. According to [Hunt], the jury was confused and it would be better if someone else represented him. [Hunt] told the court: "I think that it would be best if I kept my mouth shut and had somebody else represent me. And it would be in a more organized fashion and probably less lengthy and to my benefit to have defense." The court disagreed with [Hunt's] gloss on the trial, noting that having objections sustained during trial was one of the pitfalls of self-representation.

In denying the motion, the court stated: "I'm finding that the reasons that you gave, the length and the stage of the trial proceedings, the fact that in my mind this is part and parcel of various efforts that you've made during the course of trial to disrupt things. I'm sensing that there might be an ulterior motive in your request, given the fact that you did such things as serve a witness during the course of this trial.

"You have asked questions you've known—I've ordered you not to ask. You disobeyed orders of the Court. There has been discussion about remanding you after those things happened. You did not request a lawyer. You are only now requesting a lawyer to try to disrupt this case.

"And that is the way I'm viewing this. I recognize that you have given other explanations, but tactically speaking, I'm seeing this as something that you're doing—you're staging to disrupt the proceedings.

"I also believe that you have been effective in terms of presenting your case. The problem is that you go off on tangents and start asking questions that are not relevant to witnesses.

"So your request at this late stage of the case is denied."

Following the jury's verdict, the court ordered [Hunt] remanded to custody. As the court was setting a date for sentencing, [Hunt] requested a public defender. The court asked [Hunt] to read the probation and sentencing report and then the court would consider the request. The court told [Hunt] it would grant his request for counsel if, after reading the reports, [Hunt] still desired appointed counsel. In addition, the court reminded [Hunt] he was entitled to counsel on appeal. However, if [Hunt] wanted counsel appointed immediately, the trial court would appoint counsel, but based on [Hunt's] previous self-representation the court would "hold back on that order."

[Hunt] responded: "I'm not being clear. I have to notify other people, which I don't have . . . ." The court told [Hunt] he would have to deal with it; [Hunt] said he did not have anyone's phone numbers and he was afraid his dogs were going to die at his house. The court ordered [Hunt] be allowed to make two or three calls from jail, even if that was against jail protocol.

[Hunt], at sentencing, stated he had read the probation report. [Hunt] made no reference to his prior request for counsel, nor did he make a new request for appointment of counsel.

*Hunt*, 2015 WL 534583, at *8-10.

In *John-Charles v. California*, 646 F.3d 1243, 1245-46 (9th Cir. 2011), the Ninth Circuit considered whether a petitioner's right to counsel was violated when a California state trial court denied the petitioner's request to re-appoint trial counsel when he changed his mind about representing himself because "he was bewildered by the jury selection process and motions arguments." The Ninth Circuit ultimately rejected the petitioner's claim that he was constitutionally entitled to the reappointment of counsel, finding that the Supreme Court has not "directly address[ed] whether and under what conditions a defendant who validly waives his right to counsel has a Sixth Amendment right to reassert it later in the same stage of his criminal trial." *Id.* at 1248-49.

In *Marshall v. Rodgers*, 569 U.S. 58, 61-65 (2013), the Supreme Court confirmed the Ninth Circuit's conclusion in *John-Charles* that it is an open question whether a defendant has a constitutional right to have counsel reappointed following a valid *Faretta* waiver. In *Rodgers*, the Court noted the "tension" between the Sixth Amendment's guarantee of representation and the "concurrent" constitutional right to waive representation. *Id.* at 62-63. The Court held that the approach of California courts–which vest the trial judge with discretion when considering post-waiver request for reappointment of counsel to either grant or deny them based on a totality of the circumstances–"cannot be said" to be contrary to or an unreasonable application of Supreme Court precedent. *Id.*

In this case, the California Court of Appeal's conclusion that the trial court had discretion to grant or deny Hunt's mid-trial request to reappoint counsel and that such decision is reviewed based on the totality of the circumstances is wholly consistent with *Rodgers*. It is well-established that a state court's decision adjudicating an issue cannot be contrary to, or an

unreasonable application of, Supreme Court precedent if the Supreme Court has not yet decided the issue. *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam); *Carey*, 549 U.S. at 77; *see also Crater v. Galaza*, 491 F.3d 1119, 1123 (9th Cir. 2007). Consequently, Hunt is not entitled to relief on this ground with respect to his mid-trial request.

Likewise, the Court of Appeal denied the claim with respect to Hunt's post-verdict request to re-appoint counsel after finding any possible error harmless because it was not reasonably probable that Hunt would have obtained a more favorable result at sentencing if he had been represented by counsel. *Hunt*, 2015 WL 534583, at *11. This holding is also fully consistent with federal law. *See John-Charles*, 646 F.3d at 1251 (rejecting petitioner's argument that a possible error in refusing to re-appoint counsel was a "structural error" requiring reversal no matter how harmless it may have been because the Supreme Court "has not spoken on whether a trial court's error in ruling on a reappointment request is structural or trial error" and thus "[t]his silence compels us to defer to the state court's reasonable attempts to fill the void"). Moreover, the state court's harmless finding was reasonable in light of the record and "the threat of harm involved, the callousness of [Hunt's] acts, and the planning and sophistication of [Hunt's] actions." *Hunt*, 2015 WL 534583, at *11. Because the state courts' adjudication of this claim does not unreasonably apply or contravene federal law, Hunt is not entitled to relief on any argument advanced in support of this claim.

Ground 4. *Judicial misconduct/instructional error*

Finally, Hunt claims that the trial judge committed misconduct by instructing the jury that discovery did not apply to the restraining order proceedings. According to Hunt, that instruction deprived him of his constitutional right to present a complete defense because it

foreclosed his argument at trial that he was conducting discovery when he contacted Lemke after the issuance of the temporary restraining order.

The record indicates that, after Hunt was served with the temporary restraining order, he sent Lemke three letters. Hunt testified that he sent the letters for the purpose of discovery in preparation for the hearing on the injunction after he researched restraining orders and discovery rules pursuant to the rules of California Civil Procedure. The prosecutor objected on the ground of relevance, and the trial court allowed Hunt to testify about his research, but limited the testimony in order to prevent jury confusion. Thereafter, the court told the jury to disregard the parties' versions of the law if such version conflicted with the court's instructions. In response to the prosecutor's objection to Hunt's testimony that he researched the discovery rules, the court sustained the objection and instructed the jury that "[d]iscovery does not apply in a restraining order matter like this." The court further struck from the record Hunt's subsequent statement expressing disagreement with the court's instruction.

On direct appeal, the Court of Appeal rejected Hunt's claim, noting that there was no provision for discovery in California Civil Procedure Code § 527.6 proceedings, which involve temporary restraining orders and injunctions prohibiting harassment. This Court is bound by the state court's interpretation of California state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (a fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Hunt cites to no authority of the U.S. Supreme Court that contradicts this state court holding, and the Court is unaware of any. In the absence of such

authority, AEDPA relief is foreclosed. *See Carey*, 549 U.S. at 77. Hunt is thus not entitled to relief on this ground either.

## V. CONCLUSION AND ORDER

Hunt is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court grants a Certificate of Appealability solely with respect to Hunt's claim that the evidence was insufficient to support his convictions (Ground 2). *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: April 10, 2018.

   /s/James K. Singleton, Jr.   
JAMES K. SINGLETON, JR.
Senior United States District Judge
